Filed 2/29/16  In re C.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.B., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LEIGH B.,<br><br>    Defendant and Appellant. | G052177<br><br>(Super. Ct. No. DP025745)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

The opinion filed February 1, 2016, is modified as follows:

On page 14, at the top of the page following "section 730 evaluation" add the footnote:

"In a petition for rehearing, mother argues the opinion omitted facts material to the issues raised on appeal.  She asserts SSA admitted it did not adequately facilitate the section 730 evaluation with Dr. Bosch ordered February 2, 2015, she notes there were "paperwork problems" and "miscommunication" preventing mother

from complying with the February 2 order, the deputy county counsel delayed by 10 days preparing paperwork for the second psychological evaluation ordered March 17, and SSA's April 17 and April 29 reports stated mother repeatedly had asked about the section 730 evaluation.  She also claims the social worker did not adequately assist mother in setting up an appointment with Dr. Rogers, and the social worker testified at the disposition hearing it would not be fair to say mother did not cooperate with the section 730 evaluation, and she was not the reason it did not go forward.  Even accepting this evidence in mother's favor, we believe the record amply supports the juvenile court's conclusion mother's conduct throughout the case and her testimony made it unlikely she would meaningfully participate in any evaluation, or that an evaluation, had it been completed, would have affected the outcome of the disposition hearing."

The modifications do not change the judgment.  Appellant's rehearing petition is denied.

ARONSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

IKOLA, J.

2

Filed 2/1/16  In re C.B. CA4/3 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.B., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. LEIGH B., Defendant and Appellant. | G052177 (Super. Ct. No. DP025745) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant, Leigh B.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

Andrea Renee St. Julian, under appointment by the Court of Appeal, for Defendant and Respondent, Joel M.

*       *       *

Leigh B. (mother) appeals from the juvenile court's judgment terminating jurisdiction at the disposition hearing and placing her son, C.B. (born in November 2014), in his father Joel M.'s (father) sole physical and legal custody with monitored visits for mother. Mother contends the evidence does not support the juvenile court's finding there was a substantial danger to C.B.'s physical or emotional well-being if he was returned to her (Welf. & Inst. Code, § 361, subd. (c)(1); all statutory citations are to this code unless otherwise noted). She also asserts the court terminated jurisdiction prematurely, and should have awaited the outcome of a previously-ordered Evidence Code section 730 (section 730) evaluation. We discern no error or abuse of discretion and therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In November 2014, San Bernardino County child welfare officials filed a juvenile court petition alleging C.B. had suffered, or was at substantial risk of suffering serious physical or emotional harm "by the inability of [his parent] to provide regular care for [him] due to [his parent's]. mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).) Specifically, the petition alleged mother gave birth to C.B. in the backyard of an abandoned house without medical assistance, suffered from mental health issues, and had a criminal history.

According to the detention report, mother gave birth on a blanket in the backyard of a home formerly inhabited by the maternal grandmother. Mother claimed she was unaware the grandmother no longer lived at the residence, but a friend, whom

2

mother called during her labor, declared mother planned to deliver her baby in her mother's backyard without medical assistance.

The report also provided details concerning mother's background. In 1997, mother, then 17 years old, was the driver in an automobile collision that killed her brother and another passenger. The report noted the accident resulted in a ruptured relationship with her parents. Mother had four older children, none of whom remained in her custody. In 2003, after an argument with one of the children's fathers, she attempted to commit suicide by crashing her vehicle with two of her children on the same mountain road where the 1997 accident occurred. Mother pleaded guilty to felony child endangerment. An unnamed physician quoted in the detention report described mother "as having extreme odd, obsessive, overprotective, controlling, argumentative, [and] non-cooperative" behaviors, perhaps attributable to the brain injury she suffered in the 1997 accident.

The social worker's report for the jurisdiction hearing stated mother was argumentative and uncooperative. Mother refused to sign information release forms that would have allowed the social worker to obtain copies of mother's mental health records. Nor would mother provide information concerning C.B.'s father.[1] The report catalogued mother's prior incidents of domestic violence against her children's fathers, and described other incidents of mother's erratic behavior. For example, in 2009 mother erupted in anger at two of her children for cluttering the house, repeatedly threw objects at their father, and threatened to stab him. She was arrested and placed on a psychiatric hold (§ 5150).

In December 2014, mother waived her rights and pleaded no contest to specified allegations of the petition. The county agreed to dismiss allegations related to mother's criminal history and mental health issues. The court found C.B. came within

[1] Father has filed a letter brief joining in SSA's legal arguments and requests affirmance of the judgment.

3

the provisions of section 300, subdivision (b),[2] and transferred disposition of the case to Orange County, where the parents resided.

In a report dated February 2, 2015, the assigned social worker with Orange County Social Services Agency (SSA) stated mother insisted San Bernardino social workers had "li[ed] about everything." Mother deflected pertinent questions about her history, resisted providing information, denied the 2003 and 2009 incidents occurred, denied spending time in a psychiatric hospital, and refused to sign information release forms. C.B.'s caretaker also reported mother was uncooperative and difficult.

Father contacted the social worker and advised he wanted mother to move out of the apartment they recently had rented. He explained they had been arguing and asked for guidance on how to obtain a restraining order. A few days after father spoke with the social worker, mother accused the social worker of having bad intentions and promising father custody if he evicted mother. She also complained the social worker's interference undermined father's cooperation and caused him to have anxiety attacks.

Mother changed, appeared late, or cancelled her scheduled visits with C.B. The social worker sought a drug testing referral after mother "sounded as if she was under the influence" during a phone call. The social worker cited a prior incident where C.B. did not wake up for hours after mother breast fed him, resulting in San Bernardino social workers prohibiting her from further breast feeding.

---

[2]    Section 300, subdivision (b), establishes juvenile court jurisdiction where, "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

4

The social worker opined mother suffered from mental health issues and an inability to process information, but could not confirm her suspicions because mother continued to deny permission for the worker to obtain information concerning mother's mental health history. The social worker recommended a declaration of dependency and a case plan based on a section 730 evaluation.

On February 2, the court ordered a section 730 evaluation with Dr. Jennifer Bosch and set a completion date for early April 2015. Issues and concerns listed for the evaluator included the likelihood C.B. would be physically abused, the presence of developmental disabilities and psychiatric dysfunctions interfering with mother's parenting capacity, and whether she suffered from a mental disorder rendering her incapable of benefitting from family reunification services within 12 months. The court sought recommendations concerning treatment, placement, and visitation. The court continued the disposition hearing to March 17, 2015.

In a report dated March 17, 2015, the social worker noted mother had no positive drug results, but missed several tests. Mother appeared at SSA's offices in mid-February with a man, claiming he was a lawyer and the child's godfather, and demanded to see the assigned social worker's supervisor. Mother referred to the assigned social worker as "bitch," "psycho," and "the one with the accent," and accused her of making "fraudulent statements." In abusive and angry e-mails mother accused the child's caretakers of being "in this for the money," asserted the caretaker husband was a "psycho," claimed the caretakers were "abusing" C.B. by putting on his diaper too tight, and complained the caretaker husband had "threatened" her with cancellation of a visit after she attempted to shake his hand. During monitored visits, mother acted oddly, repeatedly exposing her breasts in public view so she could have skin-to-skin contact with the child because she believed this helped them bond. Mother refused requests to cover herself with a blanket or shirt.

5

Mother also directed her anger at father, describing him as a "sociopath" who suffered from bouts of anxiety, cut himself as a teen, and had not bonded with the child. She suggested the paternal grandmother "wan[ted] the baby for herself."

Father reported mother refused to move out of his apartment until police officers confronted her with a ramming device to break down the door. Father discovered mother had urinated on his mattress, clogged the plumbing with nylons, damaged his personal property and the apartment, and stole several of his items. Because father had complied fully with his case plan, the social worker recommended conditionally releasing C.B. to father under a safety plan (CRISP).

A therapist met with mother on two occasions, but mother believed she did not require therapy. The social worker disagreed, however. Based on "mother's actions and behaviors," the social worker suspected mother was suffering from an undiagnosed mental health disorder and it was not safe for C.B. to return to mother's care until she completed a section 730 evaluation and complied with any treatment recommendations. The social worker was also "highly concerned" mother denied being the aggressor in domestic violence situations in the face of documentary evidence to the contrary. Mother cast herself as "the victim and [was] unable to see and to admit that she has done anything wrong" and blamed "other people for her behavior."

On March 17, the juvenile court granted mother's motion to continue the disposition hearing. Mother agreed to comply with a section 730 evaluation, and the court authorized an additional 30 minutes of visitation time contingent on mother scheduling and following though with the evaluation. Over mother's objection, the court placed C.B. with father under a CRISP. On March 27, the court ordered a section 730 evaluation and report by Dr. Martha Rogers due to the court by May 1.

The social worker's report dated April 17, 2015, recommended closing the case with exit orders. Mother missed several drug testing appointments in March and April. Mother was arrested in late March 2015, apparently for an outstanding warrant or

6

violation of a restraining order. She missed several monitored visits, lying to the social worker she was ill. She continued to display odd behaviors during visits, including "excessive diaper changing and [] fascination with the child's private part," overfeeding, "stuff[ing] the child under her shirt" ostensibly to facilitate skin-to-skin contact, and obsessing over a belief the child's diapers were too tight and his nails needed trimming.

Mother's therapist, Dr. Dumain, ended individual counseling because mother failed to keep several scheduled appointments, and mother refused to sign a referral for a new therapist. Mother accused Dumain of "inappropriate" use of time, "slanted comments," and allegiance with the social worker.

Father obtained a restraining order against mother, but she repeatedly violated the order by phoning him. Her calls also violated juvenile court orders. Mother continued to malign the social worker in e-mails, describing her as "vicious," a "monster," and biased, and accused her of alienating the father and child from her. She faulted father for poor parenting skills, accusing him of not bathing C.B. or sterilizing formula bottles.

The social worker reported father had "been compliant with the conditions of the CRISP agreement" and "cooperative in welcoming the CRISP worker into his home," including unannounced visits. He actively participated in therapy and successfully completed a parenting program. He had done "everything [SSA] has asked him to do," was "caring and affectionate with" C.B., and there were no "concerns with this family." No one other than mother had concerns about C.B.'s cleanliness or father's parenting skills. The social worker recommended closing the case with orders that C.B. stay in father's care with monitored visits for mother at her expense.

At the disposition hearing in late April and early May 2015, mother testified the social worker was unprofessional, lazy, immature, and vicious. She faulted the social worker for failing to investigate father's mental health, refusing to observe visits with C.B., and retaliating against her by recommending a reduction in visits.

Mother claimed to have had a "birth plan" for a hospital birth, and denied going to her mother's home to give birth. She had not seen the maternal grandmother in a few months, but "wanted her to be a part of [her] life with [her] son" and "thought it was a good way to make amends." She arrived at the home early in the morning and sat next to the swimming pool without calling or checking to see if the maternal grandmother was home. She gave birth about eight feet from her car on pads she laid down, and she cut the umbilical cord with "crude twine" she found in her car. She did not call 911, but called a friend, who she believed was named Connie L., "because it was not an emergency."

Mother claimed to have completed parenting and child development classes, but provided no documentation. She denied missing drug tests, claiming the testing facility was closed and claimed she had the tests done at a hospital. She denied having an unresolved issue with domestic violence and claimed father had "shoved [her] down with such great force that [she] ended up on the ground" and the social worker "lie[d] on the stand" when testifying mother pushed father. Mother admitted an arrest in July 2014, did not think it involved battery, and believed it was for trespassing "in [her] own home . . . after [her] landlord broke in."

Mother denied being homeless, but refused to disclose her current address to SSA. She would not permit a home visit by the social worker, who "lied too much," but said she would allow someone else from SSA to assess her home, which was a rented room in a "beautifully appointed condo" with "new stuff" because father "stole a lot of [her] baby stuff." She was not currently working and did not explain how she paid rent. Finally, mother claimed low brake fluid led to the 2003 car accident with the children, and denied telling a first responder she wanted to kill herself after a fight with her partner.

The social worker testified mother was very uncooperative, argumentative, and displayed odd behaviors. She refused to provide releases to obtain information to

8

assist in the investigation. Mother was "very rigid" and did "not have that instinct of feeling what the child needs." Although the child cried during every visit, mother "continue[d] doing the same thing." Mother was allowed monitored visits with her older children, but a restraining order barred her from unauthorized contact, and apparently she had not seen them in a long time. Mother discontinued intensive counseling claiming she did not need therapy. Nor did mother believe she needed a domestic violence class and apparently did not comply with a request to take a child education class. The social worker believed mother's mental health posed a risk to C.B. She recommended a monthly, two-hour, professionally-monitored visit for mother. She interpreted the visitation monitors' notes as reflecting C.B. was "miserable" during mother's visits.

Dr. Fuentes, who worked at the facility where mother received treatment after the 1997 car accident, testified on mother's behalf. She sought a cognitive evaluation from him addressing whether she suffered any lingering effects of her traumatic brain injury. According to Fuentes, mother suffered diminished "nonverbal" skills, but remained in the average range, and possessed the capability of making informed decisions. Fuentes did not perform a personality evaluation, but he saw no evidence of "gross deficits in mental status." She did seem anxious, which he attributed to stress, and he did not rule out the need for medication. A brain injury might "make someone act in a way that looks like they have mental health issues," appear to be "on drugs," or "affect the way that she organizes her thoughts." The person might engage in "thinking out loud" with "less of a filter," especially when under stress. Mother had "the cognitive understanding of what it means to be a parent," appeared to understand how to care for a child, and he had no concerns about her ability to parent. But Fuentes admitted he did not know much about mother's background and history, and he "would need to do

9

a comprehensive evaluation" and more "thorough observation" before agreeing a child could be placed safely in mother's care.[3]

On May 5, 2015, the juvenile court found there would be a current risk of detrimental harm to C.B. if he was placed in mother's custody (§ 361, subd. (c)(1)). The court declared C.B. to be a dependent child, and ordered sole legal and physical custody vested with father (§ 361.2), noting "there is a significant difference in the demonstrated abilities of [mother and father] to care for this child."

The court stated it disbelieved mother's testimony concerning "the events surrounding the birth" and faulted her for failing to "make sure there were no problems at a crucial, crucial moment in the life of this child." The court cited mother's statements she summoned her friend's assistance "not for the child, not for herself, but to clean up the mess" accompanying the birth "to make this presentable." The court observed mother provided or released limited information favorable to her, and the lack of "broad access to pertinent information" raised concerns considering "what seems to be a series of events" where "mother has responded inappropriately." The court also noted mother's hostile, abrasive, and demeaning behavior "interfered in a significant part in the relationship between" mother and the social worker, and with father. The court noted that mother's negative attitude made it unlikely she would work productively with SSA, which was a reason not to retain jurisdiction as mother requested. The court also concluded "simply from mother's testimony" it was "extremely unlikely she would participate in any meaningful fashion in services or a 730 evaluation."

In June 2015, the court ordered six hours of weekly supervised visits for mother, with additional hours for specified holidays. The court noted mother's conduct at the end of visits, often standing behind the caretaker's vehicle, and the choice to give

---

[3] Dr. Seibert, who worked at the same facility as Dr. Fuentes, provided the social worker with an opinion mother's neuropsychological status did not suggest reason to doubt mother's ability to safely and effectively care for her children.

birth at the unoccupied residence, "does raise concerns about the child being potentially secreted" and warranted supervision. The Court ordered father to pay for six hours per month of supervision until the end of the calendar year.

II

DISCUSSION

A.   *Substantial Evidence Supports the Juvenile Court's Decision to Remove the Child from Mother's Custody*

Mother contends the evidence does not support the juvenile court's finding there was a substantial danger to C.B.'s physical and emotional well-being if he was returned home to her (§ 361, subd. (c)(1)). We disagree.

Mother pleaded no contest to the allegations C.B. had suffered, or was at substantial risk of suffering serious physical harm or illness in her care (§ 300, subd. (b)). Consequently, the juvenile court declared C.B. a dependent child (§ 360, subd. (d)). Section 361, subdivision (c), provides: "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." An order removing a child from parental custody is reviewed under the substantial evidence standard. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.) The reviewing court views the record in the light most favorable to the juvenile court's judgment, resolves all conflicts in the evidence in favor of the judgment, and accepts all credibility findings. (*Ibid.*; *In re Savannah M.*

11

(2005) 131 Cal.App.4th 1387, 1393 [substantial evidence is evidence that is reasonable, credible, and of solid value].)

Mother argues the juvenile court removed C.B. from her custody because of "risks that her purported mental health problems might pose to him," but "the only supposed evidence presented regarding mother's alleged mental health problems is pure speculation and conjecture." The evidence in the record, however, demonstrated mother posed a substantial danger to C.B.

Significant facts demonstrating substantial danger to C.B. include the 2003 child endangerment incident with two of her older children and mother's loss of custody of all four of the older children. The circumstances of C.B.'s birth, coupled with mother's unconvincing explanation of those events, showed mother failed to appreciate the consequences and risks attending C.B.'s delivery, and presented a danger to C.B. in the future. Mother's decision to deliver her child without medical assistance supported the court's conclusion mother had "extraordinary deficiencies in . . . judgment" and making decisions. Her refusal to provide information concerning her background, mental health history, and living arrangements, and her denials concerning domestic violence incidents, undermined her credibility and created a lack of trust in her parenting capabilities. Her refusal to attend more than two therapy sessions showed she lacked insight into her deficits or an interest in improving her parenting capabilities.

Mother's interactions with the social worker, former caretakers, and father, including her violations of the restraining order and arrests, show her to be an emotionally unstable and potentially violent individual. Mother's hostility and lack of cooperation prevented the court from identifying the source of her problems. Although mother never tested positive for drugs, she missed several Medtox testing appointments, and the social worker felt she might have been intoxicated during a phone call. But whatever the explanation, the record as recounted in detail above, shows mother posed a

12

substantial risk of harm to C.B.'s physical and emotional well-being. (See *In re J.S.* (2014) 228 Cal.App.4th 1483, 1492 [court must focus on averting harm to the child].)

Mother faults the social worker for offering an opinion on her mental health but failing to adequately investigate the matter or obtaining expert opinion to back up her hypothesis. But the record reflects mother refused to provide releases for information, selectively providing the records she deemed favorable to her position.

Mother also complains the section 730 evaluation was not completed "despite two court orders and mother begging the social worker to make sure the evaluation took place . . . ." Mother states Dr. Fuentes testified he "strongly believed that any assessment of risk mother might present to [C.B.] required a comprehensive section 730 psychological evaluation and a psychiatric evaluation." Mother argues the court and social worker could have insisted Dr. Rogers complete the evaluation (originally due May 1, 2015) before the disposition hearing concluded.

The record suggests mother played a role in the delay associated with completing a section 730 evaluation. As noted, in March 2015 the court granted mother's motion to continue the disposition hearing, mother agreed to comply with a section 730 evaluation, and the court authorized an additional 30 minutes of visitation time contingent on mother scheduling and following though with the evaluation. This suggests she had not followed through on the prior section 730 evaluation with Dr. Bosch. Regardless, Dr. Fuentes admitted he did not know much about mother's background and history, and *he* "would need to do a comprehensive evaluation" and more "thorough observation" before *he* could say a child could be placed safely in mother's care. Dr. Fuentes did not assert *the court,* which was apprised of mother's background and history, required such an evaluation. The record supports the court's conclusion that mother's conduct and testimony demonstrated it was "extremely unlikely she would participate in any meaningful fashion in services or a 730 evaluation." Under

13

these circumstances, the court did not err in proceeding to disposition without a section 730 evaluation.

B.    *The Juvenile Court Did Not Err in Terminating Dependency Jurisdiction*

Mother also argues the juvenile court erred when it found there was no need for ongoing supervision and terminated dependency jurisdiction. Again, we disagree.

Section 361.2 provides that "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Where "the court places the child with that parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents." (§ 361.2, subd. (b).)

Alternatively, the court may order the parent to assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months, considering "any concerns that have been raised by the child's current caregiver regarding the parent," (§ 361.2, subd. (b)(2)), or it may order the parent to assume custody subject to the supervision of the juvenile court with reunification services for either or both of the parents (§ 361.2, subd. (b)(3)). Orders terminating the juvenile court's jurisdiction are reviewed under an abuse of discretion standard. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; see *In re Austin P.* (2004)

14

118 Cal.App.4th 1124, 1134 (*Austin P.*) [juvenile court's conclusion continued supervision no longer necessary is a factual finding reviewed under the substantial evidence standard].)

Mother asserts "there were several concerns which showed that continued supervision of C.B. in [father's] custody was necessary." She lists concerns about father's mental health, his criminal history and ability to care for C.B., and the open hostility in the relationship between mother and father.

The record reflects father's mental health and criminal issues were relatively minor and occurred in the distant past. Father followed the conditions of the CRISP agreement, cooperated with the CRISP worker and welcomed the worker into his home, including unannounced visits, actively participated in therapy, and successfully completed a parenting program. The social worker reported father accomplished "everything [SSA] ha[d] asked him to do," was "caring and affectionate with" C.B., and there were no concerns with C.B. in his care. As noted, no one other than mother had concerns about father or his parenting skills, and father's conduct and cooperation during the proceedings was further evidence mother's concerns were unjustified. Nothing suggested father would not continue to participate in activities beneficial to C.B. without juvenile court supervision. Although mother harbored hostility toward father, the contrary was not true. Mother may not set up her own behavior as a basis to undermine the court's findings under section 361.2. The court did not err in terminating jurisdiction.[4]

---

[4] None of the cases mother cites supports reversal of the juvenile court's dispositional order. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1076, 1082 [affirming order terminating jurisdiction where evidence demonstrated the child was safe in the father's home, the father was cooperative, and the child had no demonstrated mental or emotional problems requiring continued supervision]; *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1452-1453 [affirming order terminating jurisdiction; substantial evidence supported implied finding continued supervision was no longer necessary because the father's home was appropriate and the children were happy in the home and well cared for; evidence of

C.	*The Juvenile Court Did Not Abuse Its Discretion in Ordering Mother to Pay for Supervision During Her Visits*

As noted above, the juvenile court ordered six hours of weekly supervised visits for mother (with additional hours for specified holidays), and ordered father to pay for six hours ($30 per hour) per month of supervision until the end of the calendar year. Mother contends the juvenile court abused its discretion by requiring her to pay for supervision because she was unemployed and could not afford it. She notes father was employed, had a home, and therefore had greater financial resources than she did.

The juvenile court has jurisdiction to make visitation exit orders (§ 304; *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711) to be filed in and enforced by the family law court. (§ 362.4; *In re John W.* (1996) 41 Cal.App.4th 961, 973 ["[I]n making exit orders, the juvenile court must look at the best interests of the child"; *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505 [where the juvenile court orders visitation, the court should make sure visitation will in fact occur].) We review the juvenile court's order concerning visitation for an abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [court abuses its discretion when order exceeds the bounds of reason].)

Mother does not assert the court abused its discretion by requiring supervision. The court encouraged the parties to find a lower cost supervision alternative with friends and family. Father refused to supervise visits, and it was clear he should not supervise based on mother's attitude toward about him. As SSA notes, it was reasonable for the court not to saddle father with ongoing supervision costs when he was shouldering the entire cost of caring for C.B. The court noted if mother had custody, she would incur

---

a conflict between the mother and father did not necessitate continuation of jurisdiction]; *Austin P.*, *supra*, 118 Cal.App.4th 1124 [affirming order continuing jurisdiction where the child barely knew the father, child required therapy, and mother and father had a conflicted relationship].)

expenses exceeding the costs of supervision. Nothing suggests mother could not find employment or another way to pay for supervision. Mother's argument "placing the burden on" her "to pay for [supervision] will ultimately result in the reduction (and possible elimination) of her visitation," is speculative. Indeed, she may in the future be able to establish a basis to modify the visitation order in the family court to eliminate supervision because of changed circumstances. We discern no abuse of discretion.

## III

## DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

17